UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------- X
NICHOLAS HENSON,                      :
                                      :
            Plaintiff,                :       CASE NO.: _____
                                      :
       -against-                      :       COMPLAINT
                                      :
NTN BUZZTIME, INC., ALLEN WOLFF,      :       DEMAND FOR JURY TRIAL
MICHAEL GOTTLIEB, RICHARD SIMTOB,     :
and SUSAN MILLER,                     :
                                      :
            Defendants.               :
------------------------------------- X
```

Plaintiff Nicholas Henson ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## **NATURE OF THE ACTION**

1.     This is an action brought by Plaintiff against NTN Buzztime, Inc. ("NTN" or the "Company") and members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with NTN, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and for breaching their fiduciary duty of candor. Plaintiff's claims arise in connection with the proposed reverse merger between the Company and Brooklyn ImmunoTherapeutics, LLC ("Brooklyn"), as well as the asset purchase agreement ("Asset Purchase") entered into with eGames.com Holdings LLC ("eGames.com").

2.     On August 12, 2020, NTN entered into an Agreement and Plan Of Merger and

Reorganization (the "Merger Agreement"), pursuant to which BIT Merger Sub, Inc., a wholly-owned subsidiary of NTN, will merge with and into Brooklyn, with Brooklyn surviving as a wholly owned subsidiary of NTN (the "Proposed Transaction" or "merger").

3.      Under the terms of the Merger Agreement, Brooklyn's members will exchange their equity interests for shares of NTN common stock representing between approximately 94.08% and 96.74% of the outstanding common stock of NTN immediately after the effective time of the Merger on a fully diluted basis (less a portion of such shares which will be allocated to Maxim Group LLC in respect of the success fee owed to it by Brooklyn), and NTN's stockholders as of immediately prior to the effective time, will own between approximately 5.92% and 3.26% of the outstanding common stock of NTN immediately after the effective time of the Merger on a fully diluted basis ("Exchange Ratio").

4.      NTN also entered into an Asset Purchase, dated September 18, 2020, with eGames.com, pursuant to which NTN agreed to sell all of its right, title and interest in and to the assets relating to NTN's business of licensing its interactive entertainment network and services and the tablets and related equipment used therein to eGames.com.

5.      On October 2, 2020, in order to convince NTN' public common stockholders to vote in favor of the merger, the Board authorized the filing of a materially incomplete and misleading Registration Statement on Form S-4 (the "Registration Statement") with the SEC. The Registration Statement contains material omissions concerning: (i) the financial projections for Brooklyn and NTN, (ii) the valuation analyses performed by the Company's financial advisor, Newbridge Securities Corporation ("Newbridge"); and (iii) regarding the sales process.

6.      The shareholder vote will be scheduled in the coming weeks, as the Proposed Transaction is expected to close in the fourth quarter of 2020 (the "Shareholder Vote"). It is

imperative that the material information that has been omitted from the Registration Statement is disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly determine whether to vote for or against the Proposed Transaction.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Delaware State law.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to NTN' public common stockholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' misconduct.

### JURISDICTION AND VENUE

8.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. This Court also has jurisdiction over the duty of candor claim pursuant to 28 U.S.C. § 1367.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has

minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's financial and legal advisors are headquarted in this District, and its stock trades on the New York Stock Exchange ("NYSE") which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.    Defendant NTN is a Delaware corporation with its principal executive offices located at 6965 El Camino Real, Suite 105-Box 517, Carlsbad, California 92009. The Company's common stock trades on the NYSE under the ticker symbol "NTN."

12.    Defendant Allen Wolff is, and has been at all relevant times, the Chief Executive Officer and Chairman of the Board of NTN.

13.    Defendant Michael Gottlieb is, and has been at all relevant times, a director of NTN.

14.    Defendant Richard Simtob is, and has been at all relevant times, a director of NTN.

15.    Defendant Susan Miller is, and has been at all relevant times, a director of NTN.

16.    The defendants identified in paragraphs 12 through 15 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with NTN, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Proposed Transaction

17.    NTN delivers interactive entertainment and innovative technology that helps its customers acquire, engage and retain its patrons. The company's tablets, mobile app and

technology offer engaging solutions to establishments that have guests who experience dwell time, such as in bars, restaurants, casinos and senior living centers.

18.     Brooklyn is a clinical-stage biopharmaceutical company focused on exploring the role that cytokine-based therapy can have on the immune system in treating patients with cancer.

19.     eGames is a Pennsylvania-based game development company that publishes casual personal computer games.

20.     On August 13, 2020, NTN authorized the announcement of the Proposed Transaction. The press release stated in relevant part as follows:

### NTN Buzztime, Inc. and Brooklyn ImmunoTherapeutics LLC Enter into Definitive Merger Agreement

CARLSBAD, CA AND BROOKLYN, NY, AUGUST 13, 2020, — NTN Buzztime, Inc. (NYSE American: NTN) and Brooklyn ImmunoTherapeutics LLC ("Brooklyn"), a privately-held biopharmaceutical company focused on exploring the role that cytokine-based therapy can have in treating patients with cancer, today announced that the companies have entered into a definitive merger agreement. If approved by the stockholders of NTN Buzztime and the beneficial holders of the Class A membership interests of Brooklyn,  Brooklyn will merge with a wholly-owned subsidiary of NTN Buzztime in an all-stock transaction. Following closing, which the parties expect will occur in the fourth quarter of 2020, the combined company will continue under the Brooklyn ImmunoTherapeutics name and will focus on the advancement of Brooklyn's program to further develop its cytokine-based drug for the treatment of various cancers.

Brooklyn's chief executive officer Ron Guido, MS, MS Pharm. Med., stated, "We are pleased to reach an agreement with NTN Buzztime for the proposed merger. This provides us with the opportunity, once the merger is completed, to have our shares traded in the public market and to expand our investor base, which we believe will increase our ability to advance our clinical development program exploring the treatment of certain cancers using derived cytokines. We expect this merger will also enable us to expand our resources and expertise to build momentum in our drug development program. We believe that the merger will provide benefit to both the members of Brooklyn and the stockholders of NTN Buzztime."

Mr. Guido continued: "Brooklyn is focused on exploring the role that IRX-2, a cytokine-based investigational therapy, can have on the immune system in treating patients with cancer. IRX-2's active constituents, namely  Interleukin-2 (IL-2) and

other key cytokines, are postulated to signal, enhance and restore immune function suppressed by the tumor, thus enabling the immune system to attack cancer cells. Unlike existing recombinant IL-2 therapies, IRX-2 is naturally derived from human blood cells. This may potentially promote better tolerance, broader targeting, and natural molecular conformation leading to greater activity, and permit low physiologic dosing rather than high doses needed in existing IL-2 therapies. Our ongoing development program is specifically investigating use of IRX-2 in neoadjuvant (pre-surgical) and adjuvant (post-operative) treatment for advanced head and neck squamous cell cancer. IRX-2 has received both fast track designation and orphan drug designation from the FDA for this indication. Potential use of our product candidate in other cancer indications is also being evaluated in several investigator-sponsored trials. Finally, we are currently modifying our manufacturing process to allow us to develop additional drugs with a variety of cytokine mixtures to expand our product offerings."

Allen Wolff, chief executive officer of NTN Buzztime, stated, "This transaction reflects the continuing commitment of our management team and board of directors to deliver value to our stockholders. Following a thorough review of strategic alternatives, we determined that the proposed merger with Brooklyn is in the best interest of our stockholders. We are also continuing to explore the sale of substantially all of the assets of our current business to provide additional capital and to allow the combined company to focus exclusively on Brooklyn's business following the merger. While we are in discussions with multiple parties who are interested in purchasing those assets, no definitive agreement has been entered into to date."

**About the Proposed Merger**

Under the merger agreement, immediately following the closing of the merger, the members of Brooklyn collectively will own 94.08% of the outstanding common stock of the combined company and NTN Buzztime stockholders immediately prior to the closing of the merger collectively will own 5.92% of the outstanding common stock of the combined company, which percentages are subject to adjustment based on Brooklyn's cash and cash equivalents and NTN Buzztime's net cash balance at the closing, all as more particularly set forth in the merger agreement.

The merger agreement contains customary representations, warranties and covenants made by NTN Buzztime and Brooklyn, including covenants relating to both parties using their best efforts to cause the transactions contemplated by the merger agreement to be satisfied, covenants regarding obtaining the requisite approvals of NTN Buzztime stockholders and the beneficial holders of the Class A membership interests of Brooklyn, covenants regarding indemnification of directors and officers, and covenants regarding NTN Buzztime's and Brooklyn's conduct of their respective businesses between the date of signing of the merger agreement and the closing. The merger agreement also contains certain termination rights for both NTN Buzztime and Brooklyn, and, in connection with the

termination of the merger agreement under specified circumstances, NTN Buzztime and Brooklyn may be required to pay the other party a termination fee.

As a condition to the closing of the merger, Brooklyn has agreed that it will not have less than $10 million in cash and cash equivalents and not more than $750,000 of indebtedness for borrowed money at the closing. Certain beneficial holders of Brooklyn's Class A membership interests have entered into contractual commitments to invest $10 million into Brooklyn immediately prior to the closing of the merger. Further, as a condition to the closing of the merger, NTN has committed that the deficit in its net cash at the closing, as calculated under the merger agreement, will not exceed $3 million.

The combined company, led by Brooklyn's current management team, is expected to be named "Brooklyn ImmunoTherapeutics, Inc." and be headquartered in Brooklyn, NY.  After the closing, the combined company is expected to trade on the NYSE American market under a new ticker symbol.

The merger agreement has been unanimously approved by the board of directors of NTN Buzztime, upon the recommendation of its strategic committee, and by the managers of Brooklyn. The NTN Buzztime board of directors have also recommended to NTN Buzztime's stockholders that they vote to approve issuance of the shares to the members of Brooklyn pursuant to the merger agreement, and the managers of Brooklyn have recommended to the beneficial holders of the Class A membership interests of Brooklyn that they approve the merger agreement and the merger. The transaction is expected to close in the fourth quarter of 2020, subject to approvals by the requisite stockholders of NTN Buzztime and beneficial holders of the Class A membership interests of Brooklyn described above, the continued listing of the combined company on the NYSE American, each of the company's meeting its capitalization or net cash condition, as applicable, and other customary closing conditions.

In connection with the transaction, Maxim Group LLC is serving as the financial advisor for Brooklyn and Newbridge Securities Corporation is serving as the financial advisor to NTN Buzztime. Further, Breakwater Law Group, LLP and Sheppard, Mullin, Richter & Hampton LLP are serving as legal counsel to NTN Buzztime and Akerman LLP is serving as legal counsel to Brooklyn in connection with the transaction.

21.     Brooklyn, together with egames.com, are raiding the Company for their own

benefit and stockholders will be exchanging their shares for a substantially diluted stake in

Brooklyn which has a completely unrelated line of business (e-games versus biopharmaceuticals)

and will most likely have negative cash flows (undisclosed). Brooklyn will use the reverse merger to go public to avoid significant costs in so doing, while egames.com will be obtaining the assets of the Company at a substantial discount. The non-insider stockholders of the Company will suffer as a result.

22.     Piggybacking off the uncertainty of Pandemic, the Proposed Transaction may inordinately compensate Brooklyn equity holders and reward the Individual Defendants, all at the expense of the Company's common stockholders. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for stockholders to properly exercise their corporate suffrage rights and in order to cast an informed vote on the Proposed Transaction.

**B.   <u>The Registration Statement Omits Certain Material Information</u>**

23.     On September 23, 2020, Defendants authorized the filing of a materially incomplete and misleading Registration Statement with the SEC. The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents or omits material information concerning the companies' financial projections, Newbridge's financial analyses, and conflicts concerning the sales process. This information is necessary for NTN' stockholders to make an informed decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

24.     *First*, the Registration Statement omits any of NTN' projections, including its cash flow projections. Indeed, the Registration Statement omits any information concerning the valuation for NTN, which may have been provided to NewBridge.

25.     Management has meaningful insight into the Company's financial future that the market does not. By example, if projections for NTN for 2021 were to reveal a tremendous increase in cash flows, stockholders would be more apt to vote against the merger, and inversely the same holds true. By choosing to withhold the Company's projections, the Board has chosen to blindfold stockholders to fundamental valuation information and instead, left stockholders out in the dark with only market data for guidance. This is not a game of poker where a player must conceal his unexposed cards, the object of a Registration Statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed—and so must be disclosed.

26.     In order to correct these material omissions, to the extent the data is readily available and up to the years created, Defendants must disclose: (i) Total Revenues; (ii) Total Expenses; (iii) Net Income/Loss; (iv) Cash Flows; and (v) Dividends. Failure to do so will result in shareholders not having all material information available, and should the merger be consummated, will cause shareholders to lose the intrinsic value of their shares.

27.     *Second,* concerning the omission of the free cash flow projections for the Brooklyn Projections, this too, must be disclosed. This omission is especially egregious as Brooklyn, as a pharmaceutical company, is likely to have *negative* cash flows for the foreseeable future, and stockholders need to see the expected returns (or lack thereof). Further, it is a private company, and so stockholders have no means to evaluate the adequacy of the Exchange Ratio compared to their current holdings in the Company (which trades on a public market). Stockholders are instead being asked to dilute their position in the Company, and to accept a new stake in a *pro forma* entity containing Brooklyn. Indeed, without providing these cash flows, Company stockholders will receive a misleading picture about the projected returns from their new holdings in Brooklyn.

28.     *Third*, the Registration Statement misleading states or omits material information regarding the analyses performed by Newbridge on Brooklyn in rendering its fairness opinion. Considering there is no current public market for Brooklyn stock, this information is even more important.

29.     With respect to the *Comparable Public Company Analysis*, the Registration Statement must disclose: (i) the bases for selecting each company observed; and (ii) all other inputs and assumptions underlying the calculated range of implied total equity values for Brooklyn.

30.     With respect to the *Comparable M&A Transactions Analysis*, the Registration Statement must disclose: (i) the bases for selecting each transaction observed; and (ii) all other inputs and assumptions underlying the calculated range of implied total equity values for Brooklyn.

31.     With respect to the *Discounted Cash Flow Anaylsis* for Brooklyn, the Registration Statement fails to disclose: (i) the free cash flow projections for Brooklyn; (ii) the assumptions for applying a perpetuity growth rate of 1.0%; (iii) the inputs and assumptions for utilizing a weighted average cost of capital of 18.7%; (iv) the reasons for utilizing the weighted average cost of capital method; (v) the terminal value; (vi) the discount rates and assumptions for utilizing those discount rates; and (vii) all other inputs and assumptions underlying the Proposed Transaction.

32.     Fairness opinions are fundamental to the M&A process and is ultimately what stockholders rely upon in their determination to vote for or against a transaction. Unfortunately, fairness opinions are also vulnerable to manipulation, which is why it is of the utmost important that stockholders have analyses available—such as those omitted here—to determine whether those metrics are reasonable, or whether they were unreasonably selected in order to obtain a finding of fairness. In valuing transactions such as these, it becomes all the more critical. As one

highly respected professor explained in one of the most thorough law review articles regarding the

fundamental flaws of fairness opinions, in a financial analysis a banker takes management's

forecasts, and then makes several key choices "each of which can significantly affect the final

valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such

choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff

explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Therefore, in order for stockholders to determine how to vote they need access to

the above information, and the omission of these metrics makes each financial analysis identified

inherently misleading.

33.     ***Fourth***, the Registration Statement states that the Company was entering into

confidentiality agreements with other bidders. Yet, critically, the Registration Statement fails to

disclose whether the bidders were subject to standstill agreements and whether they contained

'Don't Ask, Don't Waive' ("DADW") provisions. The failure to plainly disclose the existence of

DADW provisions and confidentiality agreements creates the false impression that any company

could have made a superior proposal. If there are confidentiality agreements containing DADW

provisions, then those parties could only make a superior proposal by breaching the agreement—

since in order to make the superior proposal, they would have to ask for a waiver, either directly

or indirectly. Any reasonable shareholder would deem the fact that the most likely potential

topping bidders in the marketplace may be precluded

34.     In sum, the omission of the above-referenced information renders the Registration

Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent

disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be

unable to make an informed decision concerning whether to vote his shares, and he is thus

threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violation of Section 14(a) of the Exchange Act)

35.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

36.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use

of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any Registration Statement or

consent or authorization in respect of any security (other than an exempted security) registered

pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

37.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that Registration Statement communications shall not contain "any statement which,

at the time and in the light of the circumstances under which it is made, is false or misleading with

respect to any material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

38.     The omission of information from a Registration Statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

39.     Defendants have issued the Registration Statement with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding the valuation analyses performed by Newbridge in support of its fairness opinion.

40.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

41.     The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that Newbridge reviewed and discussed its financial analysis with the Board, and further states that the

Board considered the financial analysis provided by Newbridge, as well as the fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Newbridge's analysis in connection with their receipt of the fairness opinions, question Newbridge as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

42.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

43.     NTN is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

44.     The misrepresentations and omissions in the Registration Statement are material to

Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

45.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46.     The Individual Defendants acted as controlling persons of NTN within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of NTN, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

47.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

48.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

49.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

50.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

51.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

**(Against the Individual Defendants for Breach of Their
Fiduciary Duty of Candor/Disclosure)**

52.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

53.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     By virtue of their role as directors and/or officers of the Company, the Individual

Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought shareholder action, and to ensure that the Registration Statement did not omit any material information or contain any materially misleading statements.

55.    As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Registration Statement to be disseminated to Plaintiff and the Company's other public stockholders.

56.    The misrepresentations and omissions in the Registration Statement are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

57.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B.    Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 16, 2020

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*